# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2003-DR-01335-SCT

*RICKY CHASE*


*v.*


*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 2/28/1990 |
| TRIAL JUDGE: | HON. JOE N. PIGOTT |
| COURT FROM WHICH APPEALED: | COPIAH COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | CYNTHIA STEWART |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | DUNN LAMPTON |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST-CONVICTION |
| DISPOSITION: | SUCCESSIVE APPLICATION FOR LEAVE TO SEEK POST-CONVICTION RELIEF GRANTED IN PART AND DENIED IN PART - 05/20/2004 |

MOTION FOR REHEARING FILED:
MANDATE ISSUED:


**EN BANC.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1.     On June 20, 2002, the United States Supreme Court decided that execution of the mentally retarded constitutes cruel and unusual punishment and is therefore prohibited by the Eighth Amendment to the United States Constitution. *Atkins v. Virginia*, 536 U.S. 304,122 S.Ct. 2242,153, L.Ed. 2d 335 (2002).   As a result, numerous hopeful death row inmates have engaged in exhaustive research and reexamination of their trial records to determine whether the issue of mental retardation was raised.  Many

who claim it was raised are now applying for leave to seek post-conviction relief.  This case involves one such death row inmate.

## I.  Facts and Procedural History

¶2.     Almost fifteen years ago, Ricky Chase and Robert Washington entered the home of Elmer and Doris Hart in Hazlehurst while Elmer was away.  They overpowered Doris, bound her, and began ransacking the home.  During the robbery, Elmer returned home and attempted to free his wife, but was shot in the head and killed.  Chase and Washington each claimed that the other was the killer and the mastermind of the robbery.

¶3.     Washington pled guilty, received a life sentence and testified against Chase, who was tried and convicted of capital murder on February 28, 1990, and sentenced to death.  Chase's conviction and sentence were affirmed by this Court on direct appeal.  *See Chase v. State*, 645 So.2d 829 (Miss. 1994), *cert. denied, Chase v. Mississippi*, 515 U.S. 1123, 115 S.Ct. 2279, 132 L. Ed. 2d 282 *rehearing denied,* 515 U.S. 1179, 116 S.Ct. 20,132 L.Ed.2d 903 (1995).  Thereafter, this Court set an execution date of October 11, 1995.

¶4.     Six days before the execution was to be carried out, Chase filed in the United States District Court for the Southern District of Mississippi, a motion for stay of execution and appointment of counsel to assist him in pursuing his federal habeas corpus remedies.  The stay was granted one day before the execution was to be carried out, and attorney Cynthia Stewart,  was appointed to represent Chase.  However, instead of proceeding in federal court, Chase returned to this Court on July 15, 1996, and filed an Application for Leave to File Motion[1] to Vacate Judgment and Death Sentence, which raised fifteen issues.

---

[1]The type of motion Chase asked this Court to allow him to pursue in the trial court is known by various names, including motion for writ of state habeas corpus, motion to vacate death sentence,

2

On August 7, 1997, this Court denied the Application in its entirety. *See Chase v. State*, 699 So. 2d 521 (Miss. 1997).

¶5. Chase then turned back to the federal courts and filed a petition for writ of habeas corpus, which was denied by the United States District Court on January 2, 2001 (separate final judgment entered January 19, 2001). The denial of federal habeas corpus was affirmed, *Chase v. Epps*, 74 Fed. Appx. 339 (5th Cir.), *rehearing and rehearing en banc* denied, 83 Fed. Appx. 674 (5th Cir. 2003), *cert. denied*. 541 U.S.__ (May 17, 2004) (No. 03-9512). In the meantime, the *Atkins* decision was handed down, which prompted Chase to file with this Court his Successive Application For Leave to File Motion to Vacate Death Sentence. ¶6. Ordinarily, a criminal defendant is allowed to file only one application with this Court for leave to proceed in the trial court with a motion for post-conviction relief.[2] However, there are narrow exceptions, one of which is where "there has been an *intervening decision* of the Supreme Court of . . . the United States which would have actually adversely affected the outcome of his . . . sentence. . . ." MISS. CODE ANN. § 99-39-27 (9) (Supp. 2000) (emphasis added). Because *Atkins* is such an "intervening decision,"[3] the Application is not barred as a successive application, and is eligible to be considered on its merits.[4] After the Successive Application was filed, the State filed its

---

and motion for PCR, or post conviction relief. Such motions, and applications to this Court for leave to file them, are governed by the Mississippi Uniform Post-Conviction Collateral Relief Act, Miss Code Ann. §§ 99-39-1 to -29 (Rev. 2000 & Supp. 2003).

[2]MISS. CODE ANN. § 99-39-27 (9). Additionally, the application was filed more than one year following Chase's conviction. Therefore, unless it falls within one of the statutory exceptions, the Successive Application is time barred by MISS. CODE ANN. § 99-39-5 (2) (Supp. 2003).

[3]The State concedes that *Atkins* qualifies as an "intervening decision which could possibly have actually adversely affected the outcome of Chase's sentence in this case."

[4]In cases where successive applications are filed, this Court may examine the "application, motion, exhibits, the prior record, and the state's response, together with any exhibits submitted

response. Chase then filed a Motion to Amend his Successive Application. The State followed up with its response. We now proceed to analyze the matters before us to determine whether this Court should rule directly on the merits of Chase's Amended Successive Application, or allow Chase to file it with the trial court, followed there by an evidentiary hearing.

## II. The Successive Application for Post-Conviction Relief

¶7. We first turn to Chase's Successive Application for Post-Conviction Relief, his Motion to Amend the Successive Application, and the State's response, and analyze each in light of *Atkins*.

¶8. Chase's Successive Application essentially asserts that Chase is mentally retarded and, therefore, exempt from the death penalty. The State is aggressively opposed to both Chase's Successive Application, and his proposed motion, for several reasons.

1. Deficiencies in the Successive Application.

¶9. The State alleges numerous deficiencies in Chase's Successive Application. We find each should be separately addressed.

*Was the Successive Application Prepared for Chase, or a Different Prisoner?*

¶10. Attached to the Successive Application is Chase's proposed Motion to Vacate Death Sentence which Chase hopes to pursue, provided his Successive Application is successful. The proposed Motion to Vacate Death Sentence included a discussion of certain test scores, alleged testing by Dr. Mark Zimmerman, school records, and testimony of a sister who refers, not to "Ricky" but, to "Ronnie." Additionally, the motion cites to an attached affidavit from Dr. Mark Webb, dated February 4, 1998. However, the motion also cites to affidavits of Dr. Zimmerman and Sandra Chase, neither of which is

therewith . . . ," and "grant or deny any or all relief requested in the attached motion . . . ." MISS. CODE ANN. § 99-39-27 (7) (a). Alternatively, this Court may "[a]llow the filing of the motion in the trial court for further proceedings . . . ." MISS. CODE ANN. § 99-39-27 (7) (b).

4

attached. The motion also states, " Chase alleges that Dr. Zimmerman examined him at Parchman on December 31, 2002."

¶11. The State responded to the Successive Application by alleging that Chase (or the lawyer who filed the Successive Application on Chase's behalf) used an Emergency Application filed with this Court in January 2003 on behalf of another death row inmate, Ron Chris Foster,[5] and simply substituted Chase's name for Foster's in the text of the Application. According to the State,"[n]one of the factual information contained in this proposed motion relates to Ricky Chase -- it is all copied verbatim from the *Foster* memorandum."

¶12. As additional support for its contention that Chase's Successive Application was not prepared for Chase, the State filed the affidavit of Mary Tucker, property officer at the Mississippi Correctional Facility located at Parchman. Tucker's affidavit stated that she had reviewed the inmate visit records, and that Dr. Zimmerman did not visit Chase on December 31, 2002. This, the State claims, supports its allegation that counsel for Chase used the petition filed on behalf of Foster, and substituted Chase's name for Foster's.

¶13. Apparently, after studying the State's allegations for approximately six weeks, counsel for Chase found them to be meritorious. On September 3, 2003, Chase filed a Motion to Amend Successive Application for Leave to File for Post-Conviction Relief. Attached thereto was the Amended Successive Application and a new (unsigned) Motion to Vacate Death Sentence. In the Motion to Amend, counsel stated that she "inadvertently failed to remove several paragraphs specific to the Foster petition . . . ."

---

[5]In January, 2003, Chris Foster filed an application for post-conviction relief, claiming that he was mentally retarded and, therefore, protected by *Atkins* from execution. This Court remanded the matter to the circuit court on the issue of his alleged mental retardation. *Foster v. State*, 848 So. 2d 172 (Miss. 2003).

¶14. By way of attempted explanation, Chase's attorney, Cynthia Stewart, claims that she had not had significant involvement in Chase's case prior to filing the motion. Characterizing Stewart's claim as "disingenuous," the State points out Stewart's considerable involvement, including that she was "sole counsel for Chase on state post-conviction review.[6]

¶15. The Motion to Amend claims that the amendment will not prejudice the State, and that "[t]he amendment is necessary in the interest of justice to correctly state the facts on which Chase relies in his *Atkins* claim." We agree.

*Did Chase Fail to Comply With the Requirements of MISS. CODE ANN. § 99-39-11 (3)?*

¶16. The State also urges us to find that Chase failed to verify the documents pending before us. Specifically, the State claims that the successive application filed by Chase fails to comply with the dictates of Miss. Code Ann. § 99-39-11 (3), which states:

> (3) The motion shall be verified by the oath of the prisoner.

The State informs us that it finds "no verification by Chase" of the "motion to amend or the attached application or proposed petition."

---

[6]There can be no doubt that the legal profession in general, and trial counsel (plaintiff and defense) and the judiciary in particular, have come under serious attack in Mississippi and, really, the entire country, in the last decade. Many, claiming they see lack of integrity and honor, have lost confidence in the system itself. This Court accepts its share of the blame for failing to require strict and faithful compliance with the ethical and professional responsibilities of those entrusted with the privilege of practicing law and serving in judicial office.

The counsel and trial judges involved in several recent cases were placed on notice that, following a short warning period, that will change. This Court will begin strictly enforcing the obligations of fidelity to the law and commitment to the oath, when practicing law and serving in the judiciary. We take this opportunity to serve notice that the warning period will soon end.

¶17.    We find no requirement of verification in MISS. CODE ANN. § 99-39-11(3).  Nor do we find anywhere any requirement of verification of an application to this Court for leave to proceed in the trial court, or of a motion to amend the application.  However, verification of the Motion to Vacate Death Sentence is required by MISS. CODE ANN. § 99-39-9(3).  Although Stewart did not even sign the Motion to Vacate Death Sentence attached to the Successive Application, she did sign the Motion to Vacate Death Sentence attached to the Motion to Amend the Successive Application.  However, the verification required by statute was not included, and Stewart did not sign the Certificate of Service.

¶18.    The provisions of Miss. Code Ann. § 99-39-27(2) (Supp. 2003), clearly require the petitioner to attach to the Application (and any successive application) filed with this Court, "the original and two (2) executed copies of the motion proposed to be filed in the trial court . . . ."  Since verification of the Motion to Vacate Death Sentence is statutorily required, execution of the motion is not complete until it is verified.  Absent "substantial compliance" with the requirements of MISS. CODE ANN. § 99-39-9(4) (Supp. 2003), a prisoner sentenced to death faces possible dismissal of his application and motion. *Id.*

¶19.    This oversight is inexcusable particularly in a death penalty case.  Nevertheless, we see nothing to be gained in this particular case by returning the Motion and Application for verification, and we are loathe to dismiss Chase's Application and Motion due to errors by his counsel.  *See Puckett v. State*, 834 So. 2d 676, 678 (Miss. 2002) (when a party is prohibited from exercising right to proceed by circumstances clearly beyond his control, and due process and fundamental fairness issues are present, relief is justified).  We therefore now proceed to evaluate the Motion to Amend Successive Application and the proposed Motion to Vacate Death Sentence.

¶20.    The argument presented by Chase's counsel in support of the Motion to Vacate Death Sentence, is as follows:

7

Ricky Chase meets the test for mental retardation under any standard. Dr. Mark Webb, who was the original expert on Chase's first post-conviction petition, evaluated Chase's medical records for mental retardation. Webb's affidavit reports that Ricky Chase is mildly mentally retarded with a 77 on the verbal, but only a 64 on the performance part of the test, indicating mild [mental] retardation and a learning disability. . . . The records reviewed include medical records from Hardy Wilson Memorial Hospital, records of Dr. Ray Pate and records of a psychological examination done by Dr. John Perry. Thus Chase meets all three of the criteria used in all of the tests cited by the Court in *Atkins*. The conclusion is inescapable: Ricky Chase cannot be sentenced to death consistent with the Eighth Amendment and *Atkins*.

¶21. Counsel for Chase supports the Motion to Vacate Death Sentence with the affidavit of Dr. Webb, claiming that Dr. Webb was "the original expert on Chase's first post-conviction petition . . . ." However, Dr. Webb's affidavit is dated February 4, 1998, six months *after* this Court denied Chase's "first post-conviction petition." *See Chase v. State*, 699 So.2d 521 (Miss. 1997). Therefore Dr. Webb's affidavit could not have been previously submitted to this Court. Since this misrepresentation does not affect Chase's substantive argument, we find it to be harmless as to Chase.

¶22. Dr. Webb is a practicing psychiatrist who was requested to "review Chase's medical records in order to give an opinion with regard to Ricky Chase's mental functioning." Dr. Webb reviewed: (1) "Chase's medical records from Hardy Wilson Memorial Hospital," (2) "the records of an examination given by Dr. Ray Pate," and (3) "the records of a psychological evaluation done by Dr. John Perry."

¶23. Based upon his review of those records, Dr. Webb provides the following opinions:

1. Chase scored a 77 on the verbal portion of the WAIS-R but only a 64 on the performance portion of the test.

2. The difference of thirteen points is indicative of a learning disability as well as a deficiency in adaptive behavior.

3. Chase's performance on the sub-parts of the WAIS-R, that difference being greater than 10%, is significant.

4. Ricky Chase suffers from mild mental retardation.

8

5.     Chase would be easily swayed by persons in authority.

6.     Chase's disabilities would call into question the veracity of any
       statement that Chase made under stress.

7.     Chase's disabilities would call into question his ability
       to make a knowing and voluntary statement.

¶24.    Finally, Dr. Webb states, "to a reasonable degree of psychiatric certainty" that further evaluation of Chase is necessary, and that, in order to evaluate Chase's disability, he would need to interview Chase, review additional medical records, perform a full medical and legal history, and conduct research into the psychological and psychometric aspects of the materials presented by counsel for Chase.

¶25.    The State, not impressed with the presentation or argument advanced by Chase, responds with several arguments.

*The State's Attack on Chase's Factual Presentation.*

¶26.    The first is that Chase "has not made a sufficient showing" for remand, and he is not entitled to an *Atkins* hearing, because "merely claiming to be mentally retarded does not suffice." As support, we are directed to *Johnson v. State*, 508 So. 2d 1126 (Miss. 1987), where Johnson, a death row inmate, attempted to stop his imminent execution by claiming insanity under MISS. CODE ANN. § 99-19-57 (2)(b). Johnson attached to his motion the affidavits of a clinical psychologist and a psychiatrist. Without discussing the contents of the affidavits, this court, stated that Johnson "failed to establish to a reasonable probability that he is presently insane." Accordingly, this Court found that Johnson "fell short of the evidentiary showing required of a proponent of this claim." *Johnson*, 508 So. 2d at 1127.

¶27.    Although *Johnson* may be persuasive in future cases, it involved a claim of insanity, wherein the law has been settled for many years. The defendant and his counsel were on notice of the requirements of law long before the trial. Here, neither Chase nor his counsel could have known the holding in *Atkins*

9

prior to trial. Nor did they have benefit of the procedural guidance offered in this opinion. Therefore, *Johnson* is inapposite here.

*The State's Attack on Dr. Webb.*

¶28. The State next turns to Dr. Webb, tacitly conceding that he claims Chase is mentally retarded. Nevertheless, the State attacks the credibility of his opinion, and the appropriateness of his affidavit, pointing out five "deficiencies" that we are urged to consider. They are that Dr. Webb:

8.      has never seen, examined or tested Chase;

9.      is a psychiatrist, rather than a psychologist;

10.     fails to identify any single area of deficiency in specific adaptive behaviors;

11.     offers only conclusory statements in his affidavit;

12.     does not state that Chase's claimed deficiencies manifested prior to age eighteen.

¶29. These are valid points and, no doubt, will be repeated to the trial judge at the hearing. However, as stated *supra*, our function in this case, given the lack of notice to Chase of the *Atkins* decision, as well as the unavailability to Chase of the procedural requirements discussed *infra*, is to determine whether Chase is entitled to a hearing, rather than to weigh the credibility of evidence to be presented at that hearing.

¶30. That is not to say that we are without authority to decide the merits of a successive application and a motion for post-conviction relief. *See* MISS. CODE ANN. § 99-39-27 (7) (Supp. 2003) (Supreme Court, in its discretion, may grant or deny any or all relief requested in the attached motion, or allow the filing of the motion in the trial court).

¶31. Here, we find that due process requires us to allow the motion to be filed in the trial court, enabling Chase and the State to fully present to the trial judge evidence as required by *Atkins*.

10

¶32.     Having attacked the credibility of the opinions offered by Dr. Webb, the State addresses the three-prong test for mental retardation.

> *The State's Attack on Chase's Claim of Mental Retardation:  Criterion A –*
> *Subaverage Intellectual Functioning.*

¶33.     Both definitions of mental retardation cited in ***Atkins*** discuss subaverage intellectual functioning. This criterion is measured by what is commonly referred to as intelligence quotient, or "IQ."[7]  The State concedes that, as tested[8] by Dr. Perry, Chase's full scale IQ of 71 is within the range of possible mental retardation.  However, the State cites the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders IV (4th Edition, 1994)[9] for the proposition that a diagnosis of mental retardation requires evaluation of both IQ and adaptive functioning.

> Thus, it is possible to diagnose Mental Retardation in individuals with IQ's between 70 and
> 75 who exhibit significant deficits in adaptive behavior.  Conversely, Mental Retardation
> would not be diagnosed in an individual with an IQ lower than 70 if there are no significant
> deficits or impairments in adaptive functioning.

DSM-IV, at 40.  Stated differently, persons in the upper (cutoff) IQ range of 71 to 75, must have exhibited *significant* deficits in adaptive behavior for a legitimate diagnosis of mental retardation.  Conversely,

---

[7]Although we do not endorse or require that experts use any particular test for determination of IQ, we note that ***Atkins*** cited, with approval, AAMR, Mental Retardation: Definitions, Classification, and Systems of Supports 5 (9th ed. 1992), for the proposition that the Wechsler Adult Intelligence Scales test (WAIS-III) is the "standard instrument in the United States for assessing intellectual functioning." ***Atkins***, 536 U.S. at 309 n.5. *See also **Russell***, 849 So. 2d at 148, which acknowledges the WAIS, Form R, for measuring full scale IQ.

[8]Dr. Perry tested Chase using the WAIS-R.

[9]Commonly referred to as DSM-IV.  This manual provided the definition of mental retardation adopted by the American Psychiatric Association, and cited in ***Atkins***. *See **Atkins***, 536 U.S at 308 n.3, *citing* Mental Retardation: Definition, Classification, and Systems of Support 5 (9th ed.1992) (discussed *infra.*).

persons with lower IQ's, but no significant impairment in adaptive functioning, may not be mentally retarded at all.

¶34. Other than pointing out that Dr. Perry stated Chase "did not seem to be performing his best" on the tests, the State offers no argument to rebut Chase's claim that his Full Scale IQ of 71 indicates subaverage intellectual functioning, and is within the range which can indicate mental retardation.

> *The State's Attack on Chase's Claim of Mental Retardation: Criterion B – Significant Limitations in Adaptive Functioning.*

¶35. The second requirement for mental retardation, according to *Atkins*, is a finding of "significant limitations in adaptive functioning in at least two . . . skill areas . . . ." *Atkins*, 536 U.S. at 308 n.3. It is in this area that the State launches its most passionate attack. The State begins by conceding that Dr. Webb claims Chase has a deficiency in adaptive behavior. However, Dr. Webb fails to identify from the specific adaptive behaviors listed in *Atkins*, any single specific area (much less two specific areas, as required by *Atkins*) of deficiency. This, claims the State, renders Dr. Webb's affidavit totally conclusory on the issue of Chase's possible mental retardation and further demonstrates that Dr. Webb's affidavit "is not of the quality or kind" useful in this case.

¶36. Contrasting the dearth of evidence that Chase is mentally retarded, the State directs our attention to the opinions of John W. Perry, Ph.D., a psychologist, and Ray Pate M.D., a psychiatrist, both of whom provided opinions to trial counsel. Those opinions were discussed in great detail in this Court's opinion on Chase's claim of ineffective assistance of counsel. *Chase*, 699 So. 2d at 527-29. For our purposes here, suffice it to say that neither doctor specifically found Chase to be mentally retarded.

12

¶37. The State provides us with a great deal of what it characterizes as evidence that Chase is not deficient in adaptive functioning, beginning with an analysis of Chase's testimony at trial, at the suppression hearing, at the hearing on the motion to revoke change of venue, and at the guilt phase of the trial.

¶38. Numerous portions of Chase's testimony are cited to demonstrate that Chase speaks and reasons too well to be mentally retarded. Certain words, phrases, analogies, and "detailed, coherent and lengthy responses" are pointed out.

¶39. The State points to numerous examples where Chase read well, spoke well, reasoned well,[10] provided lengthy,[11] complicated answers to questions, and "demonstrated insight into his life, the crime, and the situation he was in." The State then offered its opinion that "[m]entally retarded people do not have this type of insight into their situation."

¶40. The State offers other evidence that Chase does not suffer severe limitations in adaptive functioning. He was never in special education classes, never failed a grade in school, and played quarterback on the football team. He completed a welding course with the Job Corps, became a certified welder, and worked as a welder and, when he wasn't welding, he did yard work and washed cars.

¶41. Finally, the State observes that Chase cooked for his mother, had a girlfriend and other friends, and had no deficits in his social skills.

¶42. Again, while all of these arguments, if properly offered and admitted, would certainly be persuasive and interesting to the trial judge at the hearing, it is our function here only to determine whether to allow the hearing to take place.

---

[10]For instance, Chase testified, "I didn't feel like I had the right to give permission to search somebody else's car."

[11]For instance, one of Chase's answers required four pages of transcript.

13

*The State's Attack on Chase's Claim of Mental Retardation: Criterion C –*
*No Manifestation of Retardation Prior to Age Eighteen.*

¶43.  As a final assault on Chase's claim to *Atkins* protection, the State points out that Dr. Webb's opinion does not address whether Chase's claimed deficiencies in intellectual functioning manifested prior to age eighteen, as required by both definitions of "mentally retarded" adopted by this Court in *Foster*[12] and *Russell*.[13]  *See Atkins*, 536 U.S. at 308 n.3, *citing* Mental Retardation: Definition, Classification, and Systems of Support 5 (9th ed. 1992) (discussed *infra*).

¶44.  We agree that the failure to provide evidence that mental retardation manifested prior to age eighteen would be fatal to Chase's Motion to Vacate Death Penalty.

## II.  Is Ricky Chase entitled to Eighth Amendment Protection under *Atkins*?

*The Issue Before Us.*

¶45.  The only issue in Chase's Motion to Amend Successive Application is his claim that, because he is retarded, he cannot constitutionally be executed.  However, we reiterate that the issue before this Court in this case is somewhat different.  It is not our function to determine whether Chase is mentally retarded. We are required to determine whether to allow Chase to amend his Successive Application, and proceed in the trial court with his Motion to Vacate Death Sentence, that is to say, his claim that he is mentally retarded.

---

[12]*Foster*, 848 So. 2d at 175.  *See* n.4 and accompanying text, *supra*.

[13]*Russell v. State,* 849 So. 2d 95, 149 (Miss. 2003).  Willie C. Russell was convicted of capital murder, and sentenced to death.  On direct appeal, this Court affirmed.  On motion for post-conviction relief, Russell claimed to be mentally retarded.  This Court granted Russell leave to proceed in the trial court for an *Atkins* hearing on the issue of his alleged mental retardation and possible exemption from the death penalty.  *Russell* and *Foster*, were decided by this Court on the same day under separate opinions, both penned by Presiding Justice Waller.

¶46. In arriving at our decision to grant the Successive Application and remand for a hearing, we take into account the fact that Chase had no reason to know at the time of his trial that a determination by the trial court that he was mentally retarded (even slightly) would spare him the death penalty. Additionally, Chase falls into the limited class of prisoners who filed their motions for an *Atkins* hearing prior to receiving procedural guidance from this Court.

¶47. Thus, because he has arguably demonstrated that his IQ falls within the range of possible mental retardation, and because he has presented an affidavit which asserts that he suffers from "mild retardation," we cannot constitutionally deny Chase the opportunity to present the issue to the trial court. It is at the trial court that all of the arguments presented by the State will be weighed along with other evidence presented, and a final determination will then be made as to whether Chase is mentally retarded and, thus, ineligible for execution.

### III. The *Atkins* Decision.

¶48. In order to fulfill our obligation to provide guidance to counsel and our trial courts, we now address the *Atkins* decision, the definition of mental retardation to be used in our courts, and the procedure to be used for *Atkins* claims.

¶49. We are bound by oath to ensure that this Court and our trial courts remain within Constitutional limits. This requires more than a mechanical application of the *Atkins* decision. Therefore, we begin by carefully evaluating, not only the holding in *Atkins*, but also the United States Supreme Court's basis and reasoning for that holding.

*The Eighth Amendment to the United States Constitution.*

15

¶50. At the core of the *Atkins* decision is the Eighth Amendment to the United States Constitution. The deceptively simple wording of that amendment is: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

¶51. This constitutional limit on governmental power to punish has been utilized by the courts on occasion to terminate cruel, brutal practices, and to reverse disproportionate and unjust sentences of incarceration. Some examples include a life sentence under a recidivist statute, where the crimes were shoplifting two cans of sardines, and stealing the money to pay for them;[14] and handcuffing a prisoner who was already subdued to a hitching post for seven hours without water.[15]

¶52. Although the Eighth Amendment has been applied to these, and numerous other non-capital prosecutions, its application to capital cases has been the most controversial.

*National Consensus.*

¶53. There are few instances where the courts look to public opinion for guidance. However, in order to apply the Eighth Amendment to a given circumstance, a court must necessarily determine that which is "cruel and unusual." Thus, the *Atkins* Court followed the longstanding requirement that the Eighth Amendment "draws its meaning from the evolving standards of decency that mark the progress of a maturing society." *Atkins*, 536 U.S. at 311-12 (citing *Trop v. Dulles*, 356 U.S. 86, 78 S. Ct. 590, 2 L.Ed.2d 630 (1958)).

¶54. This task of discerning "evolving standards" is not an easy one. The U.S. Supreme Court has consistently held that evolving standards of decency are most reliably learned by looking to legislation enacted in the several states. *Penry v. Lynaugh*, 492 U.S. 302, 331, 109 S.Ct. 2934, 106 L.Ed.2d 256

---

[14]*Ashley v. State*, 538 So. 2d 1181 (Miss. 1989).

[15]*Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508, 153 L. Ed. 2d 666 (2002).

(1989). The reason this is so, as explained by the *Atkins* majority, is that the enactments of the various legislatures are the "clearest and most reliable objective evidence of contemporary values." *Atkins*, 536 U.S. at 312 (citations omitted). This approach was further justified by Chief Justice Rehnquist in his dissent.

> The reason we ascribe primacy to legislative enactments follows from the constitutional role legislatures play in expressing policy of a State. "[I]n a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people." *Gregg v. Georgia*, 428 U.S. 153, 175-176, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.) (quoting Furman v. Georgia, 408 U.S. 238, 383, 92 S.Ct. 2726, 33 L.Ed. 2d 346 (1972) (Burger, C.J., dissenting)). And because the specifications of punishments are "peculiarly questions of legislative policy," Gore v. United States, 357 U.S. 386, 393, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958), our cases have cautioned against using "the aegis of the Cruel and Unusual Punishment Clause" to cut off the normal democratic processes, Gregg, supra, at 176, 96 S.Ct. 2909 (quoting Powell v. Texas, 392 U.S. 514, 533, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968) (plurality opinion)).

*Atkins*, 536 U.S. at 323 (Rehnquist, C.J., dissenting). The Chief Justice further explained that sentences imposed by juries, although not afforded the same weight, are important indicators of contemporary values. *Id.*[16]

¶55.    Having thus set forth how contemporary standards of decency are discerned, the *Atkins* majority analyzed State legislative action regarding the death penalty for retarded persons. The following time line can be drawn from the opinion:

    a.    Prior to 1986, there existed no legislative action regarding "the suitability of imposing the death penalty on mentally retarded offenders. . . ." *Atkins*, 536 U.S. at 313.

---

[16]The Court pointed out that contemporary values have, in the past, served to require abolition of the death penalty as a punishment for rape of an adult woman, *Coker v. Georgia*, 433 U.S. 584, 593-96, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977), and "for a defendant who neither took life, attempted to take life, nor intended to take life." *Enmund v. Florida*, 458 U.S. 782, 789-93, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982)." *Atkins*, 536 U.S. at 312.

b.  In 1986, a mentally retarded murderer in Georgia was executed. *Id.*

c.  That same year, although not constitutionally required to do so,[17] the Georgia legislature, for the first time, enacted a statute which prohibited execution of mentally retarded prisoners. *Id.*, at 313-14, *citing* Ga. Code Ann. 17-7-131(j) (Supp. 1988).

d.  In 1988, Congress excluded mentally retarded persons from its legislation which reinstated the federal death penalty. *Id.* at 314.

e.  In 1989, Maryland enacted a statute similar to Georgia's. Md. Ann. Code, Art. 27, § 412(f)(1) (1989).

f.  In 1990, Kentucky and Tennessee became the third and fourth States to enact legislation which prohibited execution of mentally retarded persons.

g.  In 1991, a similar statute was enacted in New Mexico.

h.  In 1993 and 1994, similar statutes were enacted in Arkansas, Colorado, Washington, Indiana, and Kansas.

i.  In 1994, Congress expanded its death penalty legislation, and again exempted the mentally retarded. *Id.*

j.  In 1995, New York reinstated the death penalty, but exempted the mentally retarded.

k.  "Nebraska followed suit in 1998." *Id.*

l.  In 2000 and 2001, similar statutes were enacted in South Dakota, Arizona, Connecticut, Florida, Missouri, and North Carolina.

m.  In 2001, similar legislation passed the Texas House and Senate, but was vetoed by Governor Perry, who stated: "We do not execute mentally retarded murderers today." *Id.* (citation omitted).

---

[17]In 1989, the U.S. Supreme Court held that, under certain conditions, mentally retarded persons could be executed. *Penry v. Lynaugh*, 492 U.S. 302, 331, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). The *Atkins* Court pointed out, however, that in 1989, only two legislatures, " 'even when added to the 14 States that have rejected capital punishment completely, do not provide sufficient evidence at present of a national consensus' " *Atkins*, 536 U.S. at 314 (citing *Penry*, 492 U.S. at 334, 109 S.Ct. 2934).

¶56. In addition to the above, the *Atkins* Court pointed out that no State had passed "legislation reinstating the power to conduct such executions. . . ."*Id.* at 316.

¶57. As further evidence of the national consensus, the legislatures of the States cited above "voted overwhelmingly in favor of the prohibition," *Id*., and as a final justification, even in States with no prohibition against executing the mentally retarded, it is rarely carried out. *Id.*

¶58. Accordingly, the *Atkins* majority held that, since a national consensus exists which disapproves the execution of the mentally retarded, "death is not a suitable punishment for a mentally retarded criminal." *Id.* at 321. The Court further stated, "We therefore conclude that such punishment is excessive and that the Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." *Id.* (citation omitted).

¶59. In addition to its discussion of the national consensus, the *Atkins* majority presented a detailed justification and validation of what it perceives to be the national consensus. The Court stated that the two penological purposes served by the death penalty are retribution and deterrence. *Id.* at 319. These purposes cannot be met by the execution of mentally retarded persons. *Id.* Furthermore, the *Atkins* majority pointed out that mentally retarded persons are particularly vulnerable to the risk of false confessions and poor performance as witnesses presenting mitigating circumstances. *Id.* The majority further stated that mentally retarded defendants "may be less able to give meaningful assistance to their counsel and are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes." *Id*., at 320-21.

¶60. The two dissenting opinions took strong issue with the majority's views concerning both a national consensus, and perceived justification for it. Nevertheless, unpersuaded by the dissents, the majority held

that mentally retarded persons are exempt from capital punishment. *Atkins*, is the law, and we are bound to apply it to cases which come before this Court.

*The Scope of Atkins*.

¶61.    To fully appreciate and accept that *Atkins* exempts *all* mentally retarded persons -- even those who are minimally mentally retarded -- from execution, a careful reading of the majority opinion, as well as both dissents, is required. This is so because of ambiguous statements in the majority opinion which appear to conflict with other statements in the majority opinion, and with the understanding of the majority holding as expressed by Chief Justice Rehnquist and Justice Scalia in dissent.

¶62.    After making the case that a national consensus exists to exempt the mentally retarded from execution, the *Atkins* majority stated:

> To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded. In this case, for instance, the Commonwealth of Virginia disputes that Atkins suffers from mental retardation. **Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus**. As was our approach in *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), with regard to insanity, "we leave to the State(s) the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." *Id*. at 405, 416-417, 106 S.Ct. 2595.

*Atkins*, 536 U.S. at 317 (footnote omitted) & (emphasis added). If one accepts on its face the emphasized language, then it must follow that the persons to whom this statement applies are, in fact, mentally retarded, but not so retarded as to fall within the "national consensus" range. Stated differently, the statement implies that mentally retarded persons can constitutionally be executed, so long as they don't fall within the range "about whom there is a national consensus."

20

¶63. However, other statements in the decision indicate that the Court found no reason to disagree with the proposition that "death is not a suitable punishment for a **mentally retarded criminal**." *Atkins*, 536 U.S. at 321 (emphasis added). The Court further states, "We are not persuaded that the execution of **mentally retarded criminals** will measurably advance the deterrent or the retributive purpose of the death penalty." *Id.* (emphasis added); "[T]he Constitution 'places a substantive restriction on the State's power to take the life' of a **mentally retarded offender**." *Id.* (emphasis added) & (citation omitted).

¶64. Additionally, the statutes enacted by the various States, and cited by the majority, draw no distinction as to degrees of mental retardation and, thus, all mentally retarded persons in those States are exempt.

¶65. As a final confirmation that the *Atkins* majority intended to grant the Eighth Amendment exemption to even the most marginally mentally retarded persons, regardless of degree, the two dissenting opinions clearly assume as much. Justice Scalia lamented what he understood to be the majority's conclusion "that no one who is even slightly mentally retarded can have sufficient "moral responsibility to be subjected to capital punishment for any crime." *Id.* at 339 (Scalia, J., dissenting, joined by Rehnquist, C.J., and Thomas, J.). Chief Justice Rehnquist, also in dissent, complained that the majority had used faulty data and imprecise methodology in supporting its conclusion "that a national consensus has developed against imposing the death penalty on all mentally retarded defendants. . . ." *Id.* at 328 (Rehnquist, C.J., dissenting, joined by Scalia and Thomas, JJ.).

¶66. Accordingly, we conclude the *Atkins* majority granted Eighth Amendment protection from execution to all mentally retarded persons.

*Who is Mentally Retarded?*

¶67.    The *Atkins* Court left to the States "the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." *Id.* at 317.  As previously discussed, numerous States have already done so by legislative enactment. Mississippi, however, has no statute which prohibits the death penalty for the mentally retarded.  It is, of course, the prerogative of the Mississippi Legislature to join, or not join, those States which have enacted such legislation, and whose statutes set forth the definition of mental retardation to be applied in their respective States to the statutory prohibition. Absent such legislative enactment, however, it falls upon this Court to set the limits and define the procedure which will safeguard the Eighth Amendment protection of mentally retarded persons, as required by *Atkins*.

¶68.    In order to fulfill this requirement, we must provide a definition of mental retardation to be used in our courts.

¶69.    The *Atkins* majority cited, with approval, two specific, almost identical, definitions of "mental retardation."  The first was provided by the American Association on Mental Retardation (AAMR):

> *Mental retardation* refers to substantial limitations in present functioning.  It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, community use, self-direction, health and safety, functional academics, leisure, and work, Mental retardation manifests before age 18.

*Atkins*, 536 U.S. at 308 n.3, *citing* Mental Retardation: Definition, Classification, and Systems of Support 5 (9th ed.1992).  The second was provided by The American Psychiatric Association:

> The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the

22

central nervous system." Diagnostic and Statistical Manual of Mental Disorders 39 (4th ed.2000).

*Id.*

¶70.    The Diagnostic and Statistical Manual of Mental Disorders, from which the American Psychiatric Association definition is quoted, further states that "mild" mental retardation is typically used to describe persons with an IQ level of 50-55 to approximately 70. *Id.* at 42-43.  The Manual further provides, however, that mental retardation may, under certain conditions, be present in an individual with an IQ of up to 75.[18] *Id.* at 40.  Additionally, According to the *Atkins* majority, "[i]t is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, *which is typically considered the cutoff IQ score* for the intellectual function prong of the mental retardation definition." *Id.* citing 2 Kaplan & Sadock's Comprehensive Textbook of Psychiatry 2952 (B. Sadock & V. Sadock eds 7th ed. 2000) (emphasis added).

¶71.    These definitions were previously adopted and approved by this Court in *Foster v. State*, 848 So. 2d 172 (Miss. 2003).  This Court further held in *Foster* that

> the Minnesota Multiphasic Personality Inventory-II (MMPI-II) is to be administered since its associated validity scales make the test best suited to detect malingering. . . . Foster must prove that he meets the applicable standard by a preponderance of the evidence. . . . This issue will be considered and decided by the circuit court without a jury.

*Id.* at 175.

---

[18]This point is conceded by the State. However, IQ, alone, does not determine mental retardation.  According to the DSM-IV, "it is possible to diagnose Mental Retardation in individuals with IQ's between 70 and 75 who exhibit significant deficits in adaptive behavior.  Conversely, Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning.

¶72.    These definitions, approved in *Atkins*, and adopted in *Foster*, together with the MMPI-II,[19] provide a clear standard to be used in this State by our trial courts in determining whether, for Eighth Amendment purposes, a criminal defendant is mentally retarded.  The trial judge will make such determination, by a preponderance of the evidence, after receiving evidence presented by the defendant and the State.

*Procedure to be used.*

¶73.    Having established the definition of mental retardation to be used for purposes of Eighth Amendment protection to mentally retarded defendants, we now turn to the procedure to be used in reaching a determination of mental retardation.

¶74.    We hold that no defendant may be adjudged mentally retarded for purposes of the Eighth Amendment, unless such defendant produces, at a minimum, an expert who expresses an opinion, to a reasonable degree of certainty, that:

1.      The defendant is mentally retarded, as that term is defined by the American Association on Mental Retardation and/or The American Psychiatric Association;

2.      The defendant has completed the Minnesota Multi phasic Personality Inventory-II (MMPI-II) and/or other similar tests, and the defendant is not malingering.

¶75.    Such expert must be a licensed psychologist or psychiatrist, qualified as an expert in the field of assessing mental retardation, and further qualified as an expert in the administration and interpretation of tests, and in the evaluation of persons, for purposes of determining mental retardation.

---

[19]Although this Court has identified the MMPI-II as a test that should be given, we now clarify our position by stating that the expert should use the MMPI-II, and/or any other tests and procedures permitted under the Mississippi Rules of Evidence, and deemed necessary to assist the expert and the trial court in forming an opinion as to whether the defendant is malingering.

¶76.    Upon meeting this initial requirement to go forward, the defendant may present such other opinions and evidence as the trial court may allow pursuant to the Mississippi Rules of Evidence.

¶77.    Thereafter, the State may offer evidence, and the matter should proceed as other evidentiary hearings on motions.

¶78.    At the conclusion of the hearing, the trial court must determine whether the defendant has established, by a preponderance of the evidence, that the defendant is mentally retarded. The factors to be considered by the trial court are the expert opinions offered by the parties, and other evidence if limitations, or lack thereof, in the adaptive skill areas listed in the definitions of mental retardation approved in *Atkins*, and discussed above. Upon making such determination, the trial court shall place in the record its finding and the factual basis therefor.

*Prerequisite to a hearing.*

¶79.    With the sole exception discussed below, no defendant may be granted a hearing on the issue of Eighth Amendment protection from execution, due to alleged mental retardation unless, prior to the expiration of the deadline set by the trial court for filing motions, the defendant shall have filed with the trial court a motion, seeking such hearing. The defendant must attach to the motion an affidavit from at least one expert, qualified as described above, who opines, to a reasonable degree of certainty, that: (1) the defendant has a combined Intelligence Quotient ("IQ") of 75[20] or below, and; (2) in the opinion of the expert, there is a reasonable basis to believe that, upon further testing, the defendant will be found to be mentally retarded, as defined herein.

---

[20]As previously stated, the cutoff score for the intellectual functioning prong of the test is 75. *See* n.20, and accompanying text, *supra*. Thus, defendants with an IQ of 76 or above do not qualify for Eighth Amendment *Atkins* protection.

¶80. Upon receiving such motion with attached affidavit, and any response filed by the State, the trial court shall provide a reasonable amount of time for testing the defendant for mental retardation. Thereafter, the trial court shall set a hearing on the motion, and the matter shall proceed.

*Applications for Post-Conviction relief.*

¶81. We further hold that, for defendants whose trials were held prior to publication of this opinion, the affidavit as described above shall be attached to the defendant's application for post-conviction relief. Such application shall then be considered pursuant to the provisions of Sections 99-39-1, *et seq*.

**The Petition of Ricky Chase.**

¶82. The State makes numerous valid points concerning the lack of evidence presented by Chase on factors other than IQ. The State also raises troubling questions about the validity of the affidavit and opinions of Dr. Webb. However, such matters should be submitted to the trial court, who will determine their admissibility, and serve as the finder of fact.

¶83. Chase has submitted an affidavit from a psychiatrist stating that he suffers from mild mental retardation. Because of Chase's unusual and limited circumstances, including the fact that his conviction occurred prior to *Atkins*, and the fact that Chase had no notice of the requirements stated herein, we find that Chase has presented the bare minimum necessary under the circumstances, and is entitled to proceed to a hearing in the trial court on this issue. **CONCLUSION**

¶84. After careful consideration, this Court dismisses the Successive Application for Leave to File Motion to Vacate Death Sentence filed by Ricky Chase, as it was rendered a nullity by the Successive Application attached to Chase's Motion to Amend. The Motion for Leave to Proceed In Forma Pauperis and the Motion to Proceed Without Verification filed by Chase should be, and is hereby, granted. The Motion to Amend Successive Application for Leave to File for Post-Conviction Relief filed by Chase is

26

granted, and the Successive Application attached to the Motion to Amend is granted, such that Ricky Chase is allowed to proceed in the Copiah County Circuit Court on the sole issue of his alleged mental retardation, consistent with the requirements in this opinion.

¶85. **SUCCESSIVE APPLICATION FOR LEAVE TO FILE MOTION TO VACATE DEATH SENTENCE, DISMISSED; MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS GRANTED; MOTION TO PROCEED WITHOUT VERIFICATION GRANTED; MOTION TO AMEND SUCCESSIVE APPLICATION FOR LEAVE TO FILE MOTION TO VACATE DEATH SENTENCE GRANTED. SUCCESSIVE APPLICATION FOR LEAVE TO FILE MOTION TO VACATE DEATH SENTENCE, AS AMENDED, GRANTED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., CARLSON, GRAVES AND RANDOLPH, JJ., CONCUR. EASLEY, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY SMITH, C.J. DIAZ, J., NOT PARTICIPATING.**

**EASLEY, JUSTICE, SPECIALLY CONCURRING:**

¶86. I concur with the majority's opinion granting Chase leave to proceed in the trial court on his mental retardation claim. However, I write separately because I would require the trial courts to make specific findings on the record as to each factor in considering the defendant's claim of mental retardation.

¶87. Based upon a preponderance of the evidence, the trial court should consider these specific guidelines, where applicable. Therefore, I would require the trial court to make a formal enumeration of these specific guidelines on the record for clarity purposes.[21] The factors are as follows:

1. Whether the defendant filed in the trial court a motion with an attached affidavit of at least one qualified expert seeking a hearing on the claim of Eighth Amendment protection from execution based on mental retardation. The affidavit shall contain a statement to a reasonable degree of certainty that the defendant (1) has a combined IQ of 75 or below; and (2) upon testing, the expert has a reasonable belief

---

[21] This would work best if the trial court specifically states the factors one by one as we have held in other cases such as *Ferguson v. Ferguson*, 639 So.2d 921, 929 (Miss. 1994).

that the defendant will be found to be mentally retarded. (Any defendant whose trial was held prior to today's decision, shall attach an affidavit of at least one expert to the application for post-conviction relief.)

2.   Whether the defendant meets the definition of mental retardation in *Atkins* and as adopted by this Court in *Foster*.

3.   Whether the defendant has significant limitation in adaptive functioning in at least two areas per *Atkins* such as communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.

4.   Whether the defendant's mental deficiencies manifested prior to age 18  per *Foster* and *Russell*.

5.  Whether the defendant has sub average intellectual functioning.

6.  Whether an MMPI-II test and/or any other tests or procedures necessary to help the expert and the trial court to detect malingering has been performed and its findings.

7.  Whether a licensed psychologist or psychiatrist, qualified as an expert in the fields of assessing mental retardation, administrating and interpreting tests, and evaluating people on the basis of determining mental retardation, renders an opinion to a reasonable degree of certainty that the defendant (1) is mentally retarded as defined by the AAMR and/or the APA, and (2) completed the MMPI-II and is not a malingerer.

¶88.    At a minimum, the trial court must make these specific enumerated findings on the record when presented with a claim of mental retardation. This will promote a careful and informed decision by the trial court and avoid needless confusion on appeal. Also, this will allow the parties and their attorneys to clearly understand what is expected. For these reasons, I specially concur with the majority opinion.

**SMITH, C.J., JOINS THIS OPINION.**

28